IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

NORTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JOSEPH JUSTIN GATES,<br><br>Defendant. | MEMORANDUM DECISION<br>AND ORDER<br><br><br><br>Case No. 1:19-CR-27<br><br>Judge Dee Benson |

Before the Court is Defendant's Motion to Suppress. (Dkt. 22.) On November 26, 2019, the Court conducted an evidentiary hearing on the motion. Defendant Joseph Justin Gates was present with his counsel, Emily A. Stirba. The Government was represented by Dee W. Smith. At the conclusion of the hearing, the Court requested the production of a transcript and set a briefing schedule for the parties. (Dkt. 28.) After consideration of the briefs submitted by the parties and the testimony presented at the evidentiary hearing on the motion to suppress, the Court enters the following Memorandum Decision and Order.

1

## FACTUAL BACKGROUND

The Court finds the relevant facts as follows.[1] On March 2, 2019, Officer Curtis Ricks was working as a patrol officer with South Ogden City. (Tr. at 5.) Officer Ricks has 22 years of law enforcement experience and has been a patrol officer with the South Ogden Police Department for nearly 6 years. (*Id.*) During his employ with South Ogden, Officer Ricks has worked as a patrol officer and also as South Ogden's liaison with the Ogden Metro Gang Unit. (*Id.*)

On the evening of March 2, 2019, Officer Ricks was on routine patrol in the area of 37th Street and Riverdale Road in South Ogden. At approximately 11:00 p.m., Officer Ricks was traveling west on 37th Street toward Riverdale Road. Officer Ricks was driving a marked South Ogden Police vehicle. The patrol car was black, with no markings on the front, but marked with the word "police" down the side. The vehicle was equipped with overhead lights on the roof, but the overhead lights were not activated as Officer Ricks drove down 37th Street. (Tr. at 8.) Officer Ricks was the driver and sole occupant of the car. (Tr. at 19.)

As Officer Ricks was nearing the intersection of 37th Street and Riverdale Road, he saw a person, later identified as the Defendant, standing by a retaining wall located next to the Wasatch Auto Spa car wash. (Tr. at 7.) Wasatch Auto Spa is a self-service car wash available for use 24 hours a day. (Tr. 7-8, 24.) The retaining wall that runs along the southern side of the car wash is approximately 4 to 5 feet tall. (Tr. at 11, 30.) The Defendant was positioned on the side of the car wash that housed the coin machine and power box for the car wash. (Tr. at 11.) As Officer

---

[1]Reference to the transcript of the evidentiary hearing conducted on November 26, 2019, will be cited as "Tr. at __."

Ricks approached the car wash, he looked for but did not see any cars at the car wash, in the car wash bays, or anywhere on site. (Tr. at 8.) Officer Ricks acknowledged that the 24-hour, self-service car wash could be used for things other than washing a car, and he stated that on the night of March 2 he did not observe the Defendant to be using the car wash for *any* purpose. (Tr. at 31.) As Officer Ricks drove past the car wash, he observed the Defendant conceal himself behind the retaining wall, near the power box, so that Officer Ricks could no longer see him. (Tr. at 11.)

Officer Ricks is familiar with the area of 37th Street and Riverdale Road, and he knows it to be a "high crime area" for the South Ogden Police Department. (Tr. at 6.) Officer Ricks spends approximately 80% of his 12-hour shift patrolling this area due to the high volume of incidents that occur there. Officer Ricks has been personally involved with a variety of crimes in that area including: thefts, burglaries, drug sales, drug distributions, drug use, domestic violence incidents, fights, and robberies. (Tr. at 6.) The car wash was a location of particular concern. (Tr. at 33, 34.)

There are several other businesses in the large commercial complex where the car wash is located. (Pl.'s Ex. 1.) At 11:00 p.m., when Officer Ricks was driving west on 37th Street, all of the surrounding businesses were closed with the exception of the 24-hour car wash and Macey's Grocery Store. The car wash is located near the grocery store loading dock, on the backside of the store, which is not open to the public. (Tr. at 59; Pl.s' Ex. 1.)

After observing the Defendant at the car wash, Officer Ricks continued west on 37th Street and planned to pull in to the car wash. (Tr. 12-13, 31.) Officer Ricks continued to watch

the car wash from the rear view mirror and saw the Defendant climb over the retaining wall, run across 37th Street, cut across the corner of the church grounds located on the corner of 37th Street and Grant Avenue, and disappear from view. (Tr. at 13.)

Rather than turn into the car wash, Officer Ricks made a U turn and drove east on 37th Street to Grant Avenue. (Tr. at 13.) Officer Ricks turned right on Grant Avenue and saw the Defendant walking on the sidewalk, next to the church, heading south. (Tr. at 13 -14.)

Officer Ricks was concerned about the what he had observed. The Defendant had been at the car wash but did not have a car; the Defendant had concealed himself and hidden from view as Officer Ricks drove past the car wash; and Officer Ricks had personal knowledge that the car wash and surrounding area experienced "a lot of criminal activity." (Tr. at 13.)

Given these concerns, Officer Ricks decided to "make contact with [the Defendant]" to "see what his reason for being there was." (Tr. at 13.) Because the area on Grant Avenue was dark, Officer Ricks activated his "alley light" to illuminate the area. The alley light is located on top of the overhead light bar. Officer Ricks described it as producing white light, "like an enhanced flashlight." (Tr. at 14.) The alley light is akin to a top mounted flood light. (Def.'s Ex. V3.) Officer Ricks did not activate the emergency red and blue lights. (Tr. at 13, 14.)

Officer Ricks drove the patrol car parallel to the Defendant, rolled down the passenger window, and spoke to the Defendant through the window.[2] Officer Ricks pulled alongside the Defendant in his vehicle because he wanted to "get an explanation" for the Defendant's presence

---

[2]Although Officer Ricks' body camera is "on" during this communication with the Defendant, there is no audio, and the video depiction of the Defendant during this time is difficult to decipher. (Def.'s Ex. V-4.) The Defendant does not clearly come into view until just prior to Officer Ricks exiting the vehicle. (*Id.*)

4

at the car wash and for his other evasive behaviors. (Tr. at 15.)

Through the open window, Officer Ricks identified himself as a police officer and asked the Defendant what he was doing at the car wash. (Tr. at 36, 39:3-8)[3] The Defendant turned toward Officer Ricks, stopped briefly, and asked what he did wrong. (Tr. at 15.) As Officer Ricks responded, he noticed a bulge or an object tucked in the waistline of the Defendant's pants. (Tr. at 15.) According to Officer Ricks, the Defendant's shirt was tucked into his pants, so it wasn't under his clothing, and the object was also tucked into his pants over the shirt. (Tr. at 15.) Officer Ricks did not know what the object was, but he was concerned that the Defendant might be armed. (Tr. at 49.)[4]

Having observed something in the Defendant's waistband, Officer Ricks decided to exit his vehicle and "talk to [the Defendant] more in person." (Tr. at 16.) As Officer Ricks exited the patrol car, the Defendant turned away from him and resumed walking down the sidewalk, but looked back over his left shoulder and continued to talk in the direction of Officer Ricks. As Officer Ricks approached and moved closer to the Defendant, the Defendant leaned forward and

---

[3]   Q. You asked him what he was doing?
    A. Yes.
    Q. What his business was at the car wash.
    A. Yes.
    Q. What else did you talk to him about?
    A. That was about it.
(Tr. at 38:3-8.)

[4] The body camera video does not capture a clear image of the Defendant's waistline, or the Defendant for that matter, at the time in question. Although the Defendant asks the Court to not credit Officer Ricks' testimony on this point (Dkt. 34 at 18-19), having listened to Officer Ricks' testimony and having observed Officer Ricks' demeanor at the evidentiary hearing, the Court finds Officer Ricks to be a credible witness. The Court finds, as a matter of fact, that Officer Ricks observed a bulge or object tucked into the Defendant's waistband.

5

increased his pace. (Def.'s Ex. V-4.) Given the Defendant's behavior in turning and walking away, Officer Ricks anticipated that the Defendant was "preparing for flight." (Tr. at 44.)

Officer Ricks was equipped with a taser, holstered on the left side of his body. (Tr. at 43.) The taser cannot be removed from the holster "freely," but requires Officer Ricks to unlock and release the taser by the press of a button. (Tr. at 45.) In anticipation of Defendant's flight, as Officer Ricks walked toward the Defendant, he began to reach with his right hand, across his body to push the "release button" that would make the taser accessible. (Tr. at 44.) Officer Ricks had "released" his taser, but did not have the taser "drawn and pointed" as he walked in the direction of the Defendant. (Tr. at 44.) As the Defendant's began to walk faster, Officer Ricks moved faster. As the Defendant began to run, Officer Ricks shouted, "come here!" Officer Ricks then deployed his taser, hitting the Defendant in the back and causing him to fall the ground. (Tr. at 16:23-24 (Q: After he runs, what did you do? A: I did deploy a taser, which stopped him.").)

Officer Ricks immediately called for backup and reported: "I have got one tased." (Tr. at 47.)

After the Defendant fell to the ground, Officer Ricks shouted "stay on the ground, remain on the ground." (Tr. at 17:2-4.) The Defendant did not comply. Instead, the Defendant removed one of the taser probes, scrambled to his feet, and began running across the street. (Tr. at 51; Def.'s Ex. V-4.) Officer Ricks pursued. He tackled the Defendant in the middle of the street and both men fell to the ground. Officer Ricks and the Defendant wrestled briefly on the ground before the Defendant, once again, eluded Officer Ricks, scrambled to his feet, and began

6

running. (Tr. at 17.) Officer Ricks followed and was able to "sweep [the Defendant]" with his foot, causing the Defendant to stumble and fall but he continued to flee. (Tr. at 17.)

Meanwhile, backup arrived. A back-up officer deployed his taser, incapacitating the Defendant. (Def.'s Ex. V-5; Tr. at 17.) The Defendant fell to the ground. His body ultimately came to rest lying face up with his arms extended. (Def.'s Ex. V-5.) Officer Ricks then observed a black handgun in the Defendant's waistline. (Def.'s Ex. V-5; Tr. at 17, 18.)

The Defendant was charged in a one-count Indictment with possession of a firearm and ammunition after conviction of a felony in violation of 18 U.S.C. § 922(g)(1). The Defendant filed a Motion to Suppress, arguing that on March 2, 2019, he was unlawfully seized by Officer Ricks in violation of the Fourth Amendment and that all evidence obtained as a result of the unlawful seizure should be suppressed. In response, the Government, argues that the Defendant was lawfully seized because Officer Ricks Officer Ricks possessed a reasonable suspicion of criminal activity.

## DISCUSSION

The Fourth Amendment to the United States Constitution protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The Supreme Court has explained that a person is seized only "when the officer, by means of physical force or show of authority, terminates or restrains his freedom of movement." *Brendlin v. California*, 551 U.S. 249, 254 (2007). In *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court established that a law enforcement officer "may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating

possibly criminal behavior even though there is no probable cause to arrest." *Id.* at 22. Consistent with the Fourth Amendment, "the police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion . . . that criminal activity 'may be afoot,' even if they lack probable cause under the Fourth Amendment." *United States v. Sokolow*, 490 U.S. 1, 7 (1980) (quoting *Terry*, 392 U.S. at 20).

The Government in this case concedes that the Defendant was seized on March 2, 2019. The Government disputes, however, the precise timing of that seizure.

The Defendant claims he was seized for Fourth Amendment purposes when Officer Ricks pulled the patrol car alongside the Defendant and then, through the passenger window, engaged the Defendant in conversation regarding his presence at the car wash. The Government claims that the Defendant was not seized until Officer Ricks issued the order to stop and applied force to stop the Defendant.

Accordingly, the Court must determine (1) when the Defendant was seized for Fourth Amendment purposes; and (2) whether, at the time Defendant was seized, Officer Ricks had reasonable suspicion of criminal activity. "[T]he defendant bears the burden of proving whether and when the Fourth Amendment was implicated (i.e., the point at which he ... was 'seized'), the government bears the burden of proving the reasonableness of the officer's suspicion." *United States v. Hernandez*, 847 F.3d 1257, 1263 (10th Cir. 2017).

## I. WHEN DID THE SEIZURE OCCUR

"The Fourth Amendment does not proscribe all contact between the police and citizens." *INS v. Delgado*, 466 U.S. 210, 215 (1984). The Supreme Court has made clear that "law

enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, [or] by putting questions to him if the person is willing to listen." *Florida v. Bostick*, 501 U.S. 429, 434 (1991). "Even when law enforcement officers have no basis for suspecting a particular individual, they may pose questions [and] ask for identification ... provided they do not induce cooperation by coercive means. *United States v. Grayton*, 536 U.S. 194, 200-01 (2002) (citations omitted). "These are referred to as consensual encounters which do not implicate the Fourth Amendment." *Hernandez*, 847 F.3d at 1263; *see United States v. Lopez*, 443 F.3d 1280, 1283 (10th Cir. 2006).

As stated above, it is "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen [that a court] may conclude that a 'seizure' has occurred." *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968); *see also Brendlin v. California*, 551 U.S. 249, 254 (2007). Whether a seizure occurred is a matter of law. *United States v. Salazar*, 609 F.3d 1059, 1064 (10th Cir. 2010).

In order to determine whether a particular encounter constitutes a seizure, a court must consider, in light of all of the surrounding circumstances, whether "the police conduct would have communicated to a reasonable person that he was not free to decline the officers' requests or otherwise terminate the encounter." *Florida v. Bostick*, 501 U.S. 429, 439 (1991). This test "allows officers to make inquiries so long as they don't throw their official weight around unduly." *Hernandez*, 847 F.3d at 1263.

This inquiry is objective: "As long as a reasonable innocent person, as opposed to a

person knowingly carrying contraband, would feel free to leave, such encounters are consensual and need not be supported by reasonable suspicion of criminal activity." *United States v. Laboy*, 979 F.2d 795, 799 (10th Cir. 1992). "There are no per se rules that govern this inquiry; rather every case turns on the totality of the circumstances presented." *Hernandez*, 847 F.3d at 1264.

The United States Court of Appeals for the Tenth Circuit has set forth a non-exhaustive list of factors to be considered in making this determination:

> the location of the encounter, particularly whether the defendant is in an open public place where he is within the view of persons other than law enforcement officers; whether the officers touch or physically restrain the defendant; whether the officers are uniformed or in plain clothes; whether their weapons are displayed; the number, demeanor and tone of voice of the officers; whether and for how long the officers retain the defendant's personal effects such as tickets or identification; and whether or not they have specifically advised the defendant at any time that he had the right to terminate the encounter or refuse consent.

*United States v. Hernandez*, 847 F.3d 1257, 1264 (10th Cir. 2017) (quoting *United States v. Lopez*, 443 F.3d 1280, 1284 (10th Cir. 2006)).

Additionally, and of particular relevance in this case, the Tenth Circuit has provided:

> when police officers pursue a citizen in their squad car while the citizen is on foot, courts will consider whether the officers activated their siren or flashers, operated their car in an aggressive manner to block the citizen's course or otherwise control the direction or speed of his movement, displayed their weapons, or commanded the citizen to halt.

*Id.* Finally, "[a]lthough no single factor is dispositive, the 'strong presence of two or three factors' may be sufficient to support the conclusion a seizure occurred." *Id.*

For the reasons set forth below, in light of the surrounding circumstances, the Court concludes that the initial encounter between Officer Ricks and the Defendant, which transpired through the passenger window of the patrol car, was not a seizure within the meaning of the

Fourth Amendment. Said another way, a reasonable innocent person would have felt free to leave. *Laboy*, 979 F.2d at 799.

The encounter in this case began when Officer Ricks pulled his police cruiser alongside the Defendant, rolled down the passenger window, and asked the Defendant through the open window the reason for his presence at the car wash. (Tr. at 7.) Given the dark conditions on the street, Officer Ricks had turned on the overhead "alley lights." At no time did Officer Ricks activate the emergency lights or flashers. Officer Ricks was the only officer present on the scene and he remained in his vehicle throughout the entirety of the initial encounter. Officer Ricks was in uniform, but did not display his weapon, and given that he was seated in the driver's seat of the patrol car, no weapon would have been visible. Officer Ricks did not operate his vehicle in an aggressive manner. He did not attempt to block the Defendant's course of travel with his vehicle, rather he pulled alongside the Defendant as he walked down a public sidewalk on a public and open street.

Although the Tenth Circuit has stated that the "very presence of a police car driving parallel to a ... pedestrian could be somewhat intimidating," it has also acknowledged that "this kind of police presence does not, standing alone, constitute a seizure." *Michigan v. Chestnut*, 486 U.S. 567, 575 (1988). Such is the case here, where the "police presence" consisted only of Officer Ricks, and he pulled his vehicle alongside the Defendant, in a non-aggressive manner, and briefly asked Defendant about his presence at the car wash.

Officer Ricks did not ask the Defendant to "slow down" or "stop," nor did Officer Ricks attempt to direct the Defendant's movement in any way during this initial encounter. Officer

Ricks did not receive nor was he in possession of any of the Defendant's personal effects or identification. Additionally, the duration of the encounter was incredibly brief, lasting only a matter of seconds. Although Officer Ricks did not specifically inform the Defendant that he was under no obligation to cooperate and respond to the officer's question, the Tenth Circuit has expressly acknowledged that there is no per se rule requiring law enforcement officials to do so. *United States v. Ringold* 335 F.3d 1168, 1174 (10th Cir.), *cert. denied*, 540 U.S. 1026 (2003).

These facts, when considered in context and with all the surrounding circumstances, depict a police-citizen encounter that was brief and unobtrusive. Officer Ricks remained in his patrol car, and without impeding the Defendant's movement, spoke with the Defendant from a distance, inquiring about his presence at the car wash. Such an encounter would not have communicated to a reasonable citizen that they were not free to leave, and therefore it did not constitute a seizure within the meaning of the Fourth Amendment.

However, even assuming, *arguendo*, that this brief encounter between the Defendant and Officer Ricks amounted to a show of police authority sufficient to constitute a seizure under the Fourth Amendment, for the reasons set forth in the following section, the Court would nonetheless conclude that Officer Ricks possessed sufficient reasonable suspicion at the time of the initial encounter to lawfully conduct further inquiry.

**II.    DID THE OFFICER HAVE REASONABLE SUSPICION**

The nature of the encounter between Officer Ricks and the Defendant changed when Officer Ricks exited the patrol car following his observation of an object or bulge in the Defendant's waistband. *See Hernandez*, 847 F.3d at 1264. ("The nature of a police citizen

encounter can change, however, and 'what may begin as a consensual encounter may change to an investigative detention if the police conduct changes and vice versa.'").

The Government does not dispute that the Defendant was seized when Officer Ricks ordered him to stop and applied force by tasing him. Therefore, to satisfy the Fourth Amendment, the Government must show that Officer Ricks had reasonable suspicion of criminal activity. *United States v. Hernandez*, 847 F.3d 1257, 1263 (10th Cir. 2017).

"Reasonable suspicion is not, and is not meant to be, an onerous standard." *United States v. Simpson*, 609 F.3d 1140, 1153 (10th Cir. 2010). As a general matter, for reasonable suspicion, a police officer must simply possess "some minimal level of objective justification" for making the stop. *United States v. Winder*, 557 F.3d 1129, 1134 (10th Cir. 2009). Reasonable suspicion may be derived from a series of acts, each of them perhaps innocent if viewed separately, but which taken together warrant further investigation. *United States v. Sokolow,* 490 U.S. 1, 9-10 (1989). "In determining whether reasonable suspicion exists, [the Court] must consider the totality of the circumstances rather than assessing each factor or piece of evidence in isolation." *United States v. Padilla-Esparza*, 798 F.3d 993, 999 (10th Cir. 2015).

In making this determination, the Court must "judge the officer's conduct in light of common sense and ordinary human experience," and "consider the officer's actions using an "objective standard.'" *United States v. McHugh*, 639 F.3d 1250, 1256 (10th Cir. 2011). Under this objective standard, the court asks "whether the facts available to the detaining officer, at the time, warranted an officer of reasonable caution in believing the action taken was appropriate." *Id.* at 1255.

13

Furthermore, when determining if a detention is supported by reasonable suspicion, the court defers to the ability of a trained law enforcement officer to distinguish between innocent and suspicious actions." *Id.* at 1256. Officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." United States v. Arvizu, 534 U.S. 266, 273 (2002). Officers "need not rule of the possibility of innocent conduct. *Id.* at 277. In fact, reasonable suspicion may exist even where "it is more likely than not that the individual is *not* involved in any illegality." *United States v. Johnson*, 364 F.3d 1185, 1194 (10th Cir. 2004)).

At the time that Officer Ricks seized the Defendant he had observed the Defendant in a high-crime area, late at night. Additionally, the Defendant was present at a car wash, but without a vehicle, and he displayed evasive behavior after seeing the patrol car. Officer Ricks also observed a the presence of a bulge or object in the Defendant's waistband and the Defendant's attempt to flee. Considering the totality of the circumstances preceding the seizure of the Defendant, and taking into account Officer Ricks' experience, the Court finds that Officer Ricks had reasonable and articulable suspicion that the Defendant was engaged in criminal activity.

Officer Ricks' observation of the Defendant in a high-crime area is a relevant factor in the reasonable suspicion analysis. The United States Supreme Court has explicitly stated: "[O]fficers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation." *Illinois v. Wardlow,* 528 U.S. 119, 124 (2000); *United States v. Johnson*, 364 F.3d at 1193. Although the Defendant's presence in a high-crime area, alone, cannot establish reasonable suspicion, it is

a relevant consideration. *United States v. McHugh*, 639 F.3d 1250, 1257 (10th Cir. 2011) (listing cases).

Officer Ricks testified that the area around 37th Street and Riverdale Road has a reputation for being a "high-crime area" for the South Ogden Police Department, and Officer Ricks had personal knowledge and experience in that particular area. (Tr. at 6.) Officer Ricks testified that he spends approximately 80% of his shift patrolling the area given the high volume of incidents, and he has been personally involved with numerous and various crimes in the area. (Tr. at 6.) *See United States v. Connner,* 699 F.3d 1225, 1228 (10th Cir. 2012) (referring to officers' personal knowledge and testimony regarding the area's reputation as sufficient basis for finding an area "high crime").

The fact that these events occurred late at night also lends weight to Officer Ricks' reasonable suspicion. *United States v. Conner*, 699 F.3d 1225, 1231 (10th Cir. 2012) ("Another factor in determining the existence of reasonable suspicion is the time of night." (citing *Michigan v. Long*, 463 U.S. 1032, 1050 (1983)); *Gallegos v. City of Colorado Springs*, 114 F.3d 1024, 1029 (10th Cir. 1997). Although some, including the Defendant in this case, may question whether 11:00 p.m. merits the designation "late at night," in *United States v. Conner*, 699 F.3d 1225 (10th Cir. 2012), the Tenth Circuit affirmed the district court's denial of a motion to suppress, and in doing so agreed with the district court's determination that the "late hour of the detention," which occurred at 11:00 p.m., "added weight to the reasonableness of the officers suspicions." *Id.* at 1231. The late hour of 11:00 p.m. was particularly relevant in this case because Officer Ricks observed the Defendant at a large commercial complex that housed

several businesses. At 11:00 p.m., all of the surrounding businesses were closed with the exception of the 24-hour car wash and Macey's Grocery Store. (Tr. at 59.) Although Macey's was "open," the car wash (where the defendant was observed) is located near the loading dock, non-public area of the store. (Tr. at 59; Pl.'s Ex. 1.).

In addition to the high-crime area and the late hour, additional factors added to Officer Ricks' reasonable suspicion. The Defendant was observed at commercial property while most of the surrounding businesses were closed. Although the 24-hour car wash was open, the Defendant did not have a car and the Defendant did not appear to be washing anything or using the car wash for any legitimate purpose. (Tr. at 8.) The Supreme Court has instructed that ambiguous behavior "susceptible of an innocent explanation" may still heighten a reasonable officer's suspicion and justify a detention to resolve the ambiguity. *Illinois v. Wardlow*, 528 U.S. 119, 125 (2000). Similarly, "even conduct that is lawful, when observed through the prism of experience and considered in the light of the circumstances, may warrant further investigation." *United States v. Guardado*, 699 F.3d 1220, 1225 (10th Cir. 2012).

The Defendant's attempt to conceal his presence at the car wash upon seeing the patrol car heading west on 37th Street also contributed to the officer's reasonable suspicion. "Evasive behavior is a factor" in the reasonable suspicion analysis "because while not determinative of wrongdoing, it certainly can suggest it." *United States v. Guardado*, 699 F.3d 1220, 1224 (10th Cir. 2012); *see United States v. Briggs*, 720 F.3d 1281, 1286 (10th Cir. 2013) ("Other courts have found relevant the abruptness or otherwise evasive characteristics of a suspect upon noticing the police."); *United States v. Salazar*, 609 F.3d 1059, 1069 (10th Cir. 2010) (providing that a

16

suspect's behavior as an officer approaches may be considered in determining reasonable suspicion).

The Court finds that these aforementioned facts – the Defendant's presence in a high crime area, late at night, at a car wash but without a vehicle, near other closed businesses, and the Defendant's evasive behavior – all of which were known to Officer Ricks prior to his initial encounter with the Defendant on Grant Street, provided a sufficient basis to warrant further investigation by Officer Ricks. Thus, even if the Court had concluded that the initial encounter was a "seizure," the Court would nonetheless have found that Officer Ricks had reasonable suspicion to detain or seize the defendant at that time.

However, because the Court concluded that the initial encounter was not a seizure, Officer Ricks was presented with two additional and significant facts added to reasonable suspicion in this case.

First, while talking with the Defendant through the window of the patrol car, Officer Ricks noticed an object or bulge in the Defendant's waistband and was concerned that the Defendant might be armed. (Tr. at 49.) Although Officer Ricks was not certain if the object was a gun, or whether its concealment would have been illegal, "*Terry* demands suspicion not certainty. Reasonable suspicion requires only a 'minimal level of objective justification' to support the belief that criminal activity is afoot." *Guardado*, 699 F.3d at 1224. Under the circumstances then known to Officer Ricks, the possibility that the Defendant might possess a concealed weapon at the very least heightened reasonable suspicion that criminal activity was afoot. *See United States v. Briggs*, 720 F.3d 1281, 1289 (10th Cir. 2013).

17

Second, as Officer Ricks exited his patrol car and attempted to engage the Defendant in further conversation, the Defendant turned away from Officer Ricks and attempt to flee. The Defendant's flight is a pertinent factor in determining reasonable suspicion. *Wardlow*, 528 U.S. at 124; *United States v. Guardado*, 699 F.3d 1220, 1224 (10th Cir. 2012) (finding that the defendant's "flight from police compounded [the officers'] reasonable suspicion that [the defendant] was engaged in some type of criminal activity"). "Headlong flight – wherever it occurs – is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of it." *Wardlow*, 528 U.S. at 124.

"The Fourth Amendment merely requires commonsense judgments and reasonable inferences." *Id.* at 124-25. In this case, several factors combined to create an objectively reasonable suspicion that criminal activity was afoot. Therefore, the Court finds that the seizure did not violate the Fourth Amendment.

## CONCLUSION

The Defendant's Motion to Suppress (Dkt. 22) is DENIED.

DATED this 25th day of February, 2020.

_____
Dee Benson
United States District Judge